**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

UNITED STATES OF AMERICA,

                Plaintiff,

-vs-                                        Case No.:  2:09-cr-64-FtM-36SPC

JAMES DERISMA

                Defendant.

_____

**REPORT AND RECOMMENDATION**

**TO THE UNITED STATES DISTRICT COURT**

      On August 19, 2010, the Grand Jury returned a two-count indictment against defendants James Derisma and Kristy Pastore.  Defendant Derisma is charged with Count I possession with intent to distribute more than 5 grams of a mixture or substance containing a detectable amount of cocaine base, known as crack cocaine, and Count II, possession with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine.  (Indictment, Doc. #10).

      This matter came before the Court on April 22, 2011, May 25, 2011, and May 26, 2011, for a competency hearing.  Defendant had previously filed a Motion to Determine Mental Competency of Defendant (Doc. #69) on March 22, 2010, which this Court granted, and ordered that Defendant be examined.  The Honorable John E. Steele subsequently held a competency hearing on May 20, 2010, during which the Parties stipulated and agreed that Defendant was not currently competent to stand trial.  (Doc. #89).  Judge Steele found that James Derisma suffered from a mental disease or defect rendering him mentally incompetent to stand trial to the extent that he was unable to

understand the nature and consequences of the proceedings against him and to assist properly in his defense pursuant to 18 U.S.C. § 4241.  Accordingly, the Court committed Derisma to the custody of the Attorney General for hospitalization and treatment in a suitable facility for such a reasonable period of time, not to exceed four (4) months, as was necessary to determine whether there is a substantial probability that in the foreseeable future Derisma would attain the capacity to permit the proceedings to go forward.  Defendant was then transported to the Federal Medical Center in Butner, North Carolina ("Butner" or "FMC Butner") where he underwent treatment and evaluation.

The matter of competency is back before this Court to determine whether Derisma is now competent to stand trial and has attained the capacity such that the proceedings in this case may go forward.  The Court held a three-day competency hearing during which time experts for both the Government and Derisma testified regarding Defendant's competency to stand trial.  The Defendant was present and represented by retained counsel, David Brener.  The Government was represented by Assistant United States Attorney Tama Caldarone.

After considering the totality of the evidence, including the testimony of the witnesses, the evidence introduced, the record, and the arguments of counsel, the Court respectfully recommends that Derisma is competent to stand trial.

### Standard

"Unquestionably, due process requires a defendant to be competent to stand trial." United States v. Andrews, 469 F.3d 1113, 1117 (7th Cir.2006) (quoting United States v. Collins, 949 F.3d 921, 924 (7th Cir.1991)). See also Cooper v. Oklahoma, 517 U.S. 375, 384-85, 116 S. Ct. 1373, 134 L. Ed.2d 498 (1996) (noting that the Supreme Court has "repeatedly and consistently recognized that the criminal trial of an incompetent defendant violates due process.") (internal quotation and citation

omitted); Eddmonds v. Peters, 93 F.3d 1307,1314 (7th Cir.1996) ("The Constitution forbids trial of one who, for whatever reason, is unfit to assist in his own defense because our adversarial system of justice depends on vigorous defenses.").

Incompetency means "suffering from a mental disease or defect rendering [defendant] mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  18 U.S.C. § 4241(a).  The Defendant assumes the burden of proof to establish his incompetency by a preponderance of the evidence. Cooper, 517 U.S. at 355; Battle v. United States, 419 F.3d 1292, 1298 (11th Cir. 2005); Carter v. United States, 2:09-CV-444-FTM-29DNF, 2010 WL 1480365, *3 (M.D. Fla. Apr. 6, 2010). The Defendant is entitled to no presumption of incompetency. Id.  "The legal test for competency is whether the defendant had 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and whether he had 'a rational as well as factual understanding of the proceedings against him.'" United States v. Cruz, 805 F.2d 1464, 1479 (11th Cir.1986) (quoting Dusky v. United States, 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960)).  "[T]he mere presence of a mental disease or defect is not sufficient to render a defendant incompetent ...." United States v. Rothman, No. 08-20895-CR, 2010 WL 3259927, at *7 (S.D. Fla. Aug. 18, 2010) (citing United States v. Liberatore, 856 F. Supp. 358, 360 (N.D. Ohio 1994)).  "Incompetency to stand trial is not defined in terms of mental illness. As such, a defendant can be competent to stand trial despite being mentally ill and similarly a defendant can be found incompetent to stand trial without being mentally ill." United States v. Williams, No. 5:06-cr-36-OC-10GRJ, 2007 WL 1655371, at * 5 (M.D. Fla. June 7, 2007) (internal citation and quotation marks omitted); see also Medina v. Singletary, 59 F.3d 1095, 1107 (11th Cir.1995) (noting that "not every manifestation of mental

illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges.") (citation omitted).

Psychiatric and psychological examinations are governed by 18 U.S.C. § 4247(b), which provides in pertinent part:

> A psychiatric or psychological examination ordered pursuant to this chapter shall be conducted by a licensed or certified psychiatrist or psychologist, or, if the court finds it appropriate, by more than one such examiner. Each examiner shall be designated by the court....

Pursuant to 18 U.S.C. § 4247(c), report of examination shall include:

> (1) the person's history and present symptoms;

> (2) a description of the psychiatric, psychological, and medical tests that were employed and their results;

> (3) the examiner's findings; and

> (4) the examiner's opinions as to diagnosis, prognosis, and

>> (A) ... whether the person is suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

Once there is an evaluation, the proceedings are governed by 18 U .S.C. § 4241(d), which provides that if, after a hearing, "the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.... for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward."

In determining whether the defendant has sufficient present ability to consult with his lawyer, courts have considered the following factors: 1) the state of the defendant's memory, since he should be able to relate pertinent facts, names and events to his attorneys (although the defendant need not remember every fact that trial might encompass); 2) the extent to which relevant evidence could be reconstructed from communications made by the defendant to his counsel or from independent sources; 3) an adequate ability to review and evaluate documents and other written evidence bearing on the case; 4) an appreciation of the Government's evidence against him; 5) the ability to consider the wisdom of taking a course other than standing trial on the merits; 6) the ability to decide objectively whether to exercise his constitutional right to take the stand, and if he does take the stand, the ability to testify in an intelligent, coherent and relevant manner; 7) the ability to remain sufficiently alert and responsive so as to follow and recognize any discrepancies in the testimony of witnesses; and 8) the ability to discuss the testimony with his attorneys and to postulate questions to the witnesses through counsel.  United States v. Passman, 455 F. Supp. 794, 796-97 (D.D.C. 1978) (citations omitted).  "In the final analysis, the determination of competency is a legal conclusion; even if the experts' medical conclusions of impaired ability are credited, the judge must still independently decide if the particular defendant was legally capable of reasonable consultation with his attorney and able to rationally and factually comprehend the proceedings against him." United States v. Makris, 535 F.2d 899, 908 (5th Cir. 1976).[1]  "In determining a defendant's competency to stand trial, the Court may rely one of two competing competency opinions given by

---

[1]All decisions of the Fifth Circuit prior to October 1, 1981, have been adopted as decisions of the Eleventh Circuit.  Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981).

qualified experts." United States v. Gerlt, 2011 WL 110790, * (W.D. Mo. Jan. 13, 2011)  (citing United States v. Ghane, 490 F.3d 1036, 1040 (8th Cir. 2007)).

"[A] criminal defendant must lack either 'a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' or 'a rational as well as factual understanding of the proceedings against him.'" United States v. Miller, 531 F.3d 340, 350 (6th Cir. 2008) (quoting Drope v. Missouri, 420 U.S. 162, 172, 95 S. Ct. 896, 43 L. Ed.2d 103 (1975)).  "In determining competency, the district court may rely on numerous factors, including expert medical opinions and the court's observation of the defendant's demeanor. Low intelligence or a mental deficiency does not render a defendant incompetent per se." United States v. Robinson, 253 F.3d 1065, 1068 (8th Cir. 2001) (internal citations omitted).

In United States v. Hogan, 986 F.2d 1364, 1373 (11th Cir.1993), for example, the Eleventh Circuit Court of Appeals noted that even perfectly competent defendants often do not fully comprehend the intricacies of some of the theories offered by their lawyers, and stated, "all that is required is that [the defendant] had a rational as well as factual understanding of the proceedings against him and had sufficient present ability to consult with his attorney with a reasonable degree of rational understanding." Id.  See also Median v. Singletary, 59 F.3d 1095, 1107 (11th Cir. 1995) (stating neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial).  The Court reviews the evidence in this case with these standards in mind.

**Expert Testimony**

Defendant was evaluated by defense experts Dr. Hyman Eisenstein, Ph.D., Dr. Alan J. Waldman, M.D. and by Government experts Dr. Carlton Pyant, Ph.D. and Dr. Kwanna Williamson, M.D.

_Defense Expert Dr. Hyman Eisenstein, Ph.D._

Dr. Eisenstein is a clinical psychologist with a specialty in neuropsychology. (Tr. 4). The Government stipulated to the witness' expertise. (Tr. 8-9,11-12). Based on his credentials, the Court declared Dr. Eisenstein an expert in the fields of general psychology, neuropsychology, and forensic psychology.[2] (Tr. 11-12). Dr. Eisenstein reviewed Defendant's medical records, as well as the police report and Indictment in this case, Dr. Waldman's psychiatric evaluations, and the forensic evaluation of the Defendant done at Butner, dated October 2010. (Tr. 13-14).

Dr. Eisenstein conducted a neuropsychological evaluation of Defendant that lasted over three days: February 16, 2011, February 28, 2011, and March 1, 2011 - after Defendant had returned from Butner to the Lee County Jail. (Tr. 95). The purpose of the evaluations was to render an opinion as to whether Defendant was competent to stand trial. (Tr. 98). He testified that Defendant is HIV positive and contracted nocardia brain abscesses in late 2009, early 2010, for which he had to have brain surgery to remove. (Tr. 14,18). He was 33 at the time of Dr. Eisenstein's evaluations. (Tr.

---

[2]Dr. Eisenstein obtained a masters degree in both counseling, psychology, and education from Loyola University of Chicago. (Tr. 5). He received his Ph.D. in clinical psychology in 1982 from the University of Health Sciences Chicago Medical School, followed with a pre-doctoral internship at Fairfield Hillside Hospital. (Tr. 5). He is a diplomat with the American Board of Professional Neuropsychology. (Tr. 5-6). He is currently in private practice. (Tr. 5). Dr. Eisenstein has been involved with thousands of forensic cases in the criminal justice system over twenty-five years, in which he has conducted competency, sanity, and neuropsychological examinations. (Tr. 7).

45).  The Defendant currently suffers from a seizure disorder, which he takes medication to control.  (Tr. 19).  Dr. Eisenstein also obtained a family history regarding Defendant, speaking with his wife and his mother.  (Tr. 16).  Defendant reported completing the ninth or tenth grade, being in special education, and repeating some grades, though no school records were available.  (Tr. 16-17).  Defendant's employment has included menial labor.  (Tr. 17).

When Dr. Eisenstein first met Defendant for evaluation in early 2011, Derisma repeatedly told him he was not crazy, stating "I'm very sane but messed up and I have memory problems."  (Tr. 31).  He was also paranoid and appeared depressed.  (Tr. 31,33).  Defendant was cooperative during these evaluations and showed effort to complete the assigned tasks.  (Tr. 34-35).  Defendant was administered the test of memory malingering (TOMM), which he passed, which indicated to Dr. Eisenstein that Defendant was giving him his best effort and was not faking.  (Tr. 37).  The doctor also gave Derisma an IQ test in conjunction with the TOMM.  (Tr. 37).  He obtained a full scale IQ of 70, with a percentile of 2, which is low enough to be part of a diagnosis of mental retardation.  The Court notes though that Defendant has not been diagnosed with mental retardation, which would require Defendant to meet other diagnostic criteria in addition to an IQ of 70.  (Tr. 38).  He obtained an IQ score of 69 in working memory, which falls in the second percentile.  (Tr. 41-42).  He obtained an IQ score of 78, which falls in the seventh percentile, in verbal comprehension.  (Tr. 45).  On information, he obtained a percentile of 25.  (Tr. 46).  Dr. Eisenstein also administered a Wechsler Test to Defendant.  (Tr. 46).  Defendant scored in the lower 9 percentile in all three subtests of the Wechsler, which is low average to severely impaired range.  (Tr. 46).  Defendant fell in the ninth grade equivalent for reading, sixth grade equivalent for reading comprehension, eighth grade equivalent for spelling, and fifth grade equivalent for arithmetic.  (Tr. 47-48).

Dr. Eisenstein also administered the Kaufman functional academic skills test.  (Tr. 48).  On arithmetic he obtained a standard score of 78, percentile of 7, which is well below average, and on reading he obtained a standard score of 68, percentile of 2, which is the lower extreme.  (Tr. 49).  Thus, he displayed significant impairment on very basic skill levels.  (Tr. 49).  He also administered the Category Test, which is a nonverbal test that assesses problem solving using error correcting feedback.  (Tr. 49).  Derisma committed 95 errors, which placed him in the severely impaired range of functioning.  (Tr. 50).  Dr. Eisenstein testified that Defendant became frustrated during this test because he was getting so many of them wrong and he could not figure out the right answer.  (Tr. 50).  During this test Derisma continuously made a stream of comments complaining about how he could not complete the task, which indicates frontal lobe disorder to Dr. Eisenstein.  (Tr. 51).  He also administered the Wisconsin Card Sorting Test, which is a frontal lobe test, which tests the ability to form abstract concepts, to shift sets, to utilize feedback, and put cards into correct categories.  (Tr. 52).  Defendant committed 35 perseverative errors during this test, which means that he had problems moving off an incorrect answer to get a correct solution.  (Tr. 53-54).  This is the category of moderately impaired, brain damaged.  (Tr. 54-55).

Dr. Eisenstein also administered the attention and concentration and trail-making tests.  (Tr. 55).  The trail-making test examines the ability to attend, concentrate, to keep track of where one was, and to figure out where one is going.  (Tr. 56).  Defendant was mildly impaired on Part A, but on Trails B, a more complex set of tasks that requires alternating between numbers and letters, he was severely impaired.  (Tr. 55-56).  Dr. Eisenstein opined that this means Defendant is slow, he gets lost, he cannot figure out where he was, which showed confusion in terms of his mental processes.

(Tr. 56).  He testified that all of the test scores fall within the very low end of the spectrum in terms of percentiles.  (Tr. 58).

Even with these test results in mind, the Court was provided with and has thoroughly reviewed numerous phone calls that were made by Defendant while at Butner and the Lee County Jail, which show evidence of Defendant's abilities to communicate while at both Butner and the Lee County Jail.  Based on the evidence presented to this Court during the time and after the Defendant was sent to Butner, it is clear that Defendant regained an ability to communicate, convey events to others, and recall events about his past.  Additionally, although the Defendant may be slow, he fell in the ninth grade equivalent for reading, sixth grade equivalent for reading comprehension, eighth grade equivalent for spelling, and fifth grade equivalent for arithmetic.  Further, he has a full scale IQ of 70 and has not been diagnosed with mental retardation.  (Tr. 38).

With regard to the report prepared by the Butner facility, Dr. Eisenstein believes that the basic problem with their forensic evaluation was that the clinicians never had the cooperation of the Defendant.  (Tr. 58-59).  It is his opinion that Defendant was not malingering when he conducted his testing.  (Tr. 65).  It is Dr. Eisenstein's opinion that Defendant failed to cooperate with testing at Butner because Defendant was sent to what he considered a mental institution and he did not want to be viewed as crazy.  (Tr. 67-68).  This was evidenced by Defendant's return from Butner and his first meeting with Defendant where the Defendant repeatedly stated he was not crazy.  (Tr. 67).

Dr. Eisenstein believes that Butner incorrectly used the VIP test on Defendant, which the manual states should not be used with individuals with historically demonstratable mental retardation or severe cognitive impairment.  (Tr. 76-78).  Individuals with severe impairment will probably receive a categorization of invalid test performance because of their extremely limited cognitive

abilities.   (Def. Ex. 8).  Dr. Eisenstein stated that the clinicians at Butner did not test Derisma's

cognitive abilities and he did not believe the VIP test should have been given to the Defendant based

on his deficits in cognitive functioning. (Tr. 78-79).   Dr. Eisenstein testified that the TOMM should

not be used to determine whether someone is malingering if that person has other reasons to not give

full effort and if they have poor cognitive skills.  (Tr. 79-82).

There is no dispute that Defendant was uncooperative during his interviews with Dr. Pyant

during his time at Butner, therefore, the validity of scores on the testing completed there by Dr. Pyant

is questionable.   Even without the benefit of neuropsychological testing done at Butner, other

evidence such as Defendant's emails, phone calls, and daily activities in the facility influenced the

Butner experts' opinions.

The remainder of Dr. Eisenstein's tests in part assessed memory, in which he performed

poorly.  (Tr. 92).  Dr. Eisenstein described Defendant's mood as volatile, moody, and he has

fluctuations, where he has energy bursts and then major feelings of depression, consistent with

frontal lobe disinhibition syndrome.  (Tr. 93).

In all, Dr. Eisenstein conducted sixteen tests on Defendant with numerous subparts.  Dr.

Eisenstein concluded that Defendant has borderline intellectual functioning at the present time and

he is not competent to proceed to trial and that his restoration to competency remains questionable

and is dependent on his ability to independently recall the events preceding to his arrest.  (Tr. 99).

He believes that his major issue is his inability to recall independently the events that led up to his

arrest as he does not have a clear memory of those events.  (Tr. 99).   The fact that he made

statements at the time of his arrest regarding his co-defendant and the cocaine does not affect

whether he is competent to stand trial now, as the incident was prior to his brain abscesses and the

months of treatment that followed.  (Tr. 100).  It is his opinion that this does not allow him to be able

to assist in his own defense.  (Tr. 103).

*Defense Expert Dr. Alan J. Waldman, M.D.*

Dr. Waldman is a neuropsychiatrist, and practices both clinically and forensically.  (Tr. 190).

Dr. Waldman has been qualified as an expert hundreds of times, including the areas of general

psychiatry, forensic psychiatry, cognitive neurology, and neuropsychiatry, as well as the risk of sex

offender recidivism.  (Tr. 198).  Based on the credentials presented to the Court and the fact that the

Government stipulated to such, the Court accepted Dr. Waldman as an expert in the field of general

psychiatry, forensic psychiatry, cognitive neurology, and neuropsychiatry.[3]  (Tr. 200).

Dr. Waldman first met with and evaluated the Defendant on March 17, 2010, and then again

in January 2011, for a total of approximately seven hours.  (Tr. 201).  Prior to that he reviewed arrest

documents and the Indictment for this case.  (Tr. 201).  He gave his first report dated March 19,

2010, which was a letter that gave preliminary results of his evaluation of Derisma on March 17,

2010. (Def. Ex. 5).  After this, Dr. Waldman prepared a formal report, dated March 25, 2010.  (Def.

Ex. 6).  The purpose of the evaluations was to render an opinion as to whether Defendant was

---

[3]Dr. Waldman received his medical degree from Case Western Reserve University College of Medicine in 1986.  (Tr. 191).  He completed his residency in psychiatry at the University of Florida and a fellowship in forensic psychiatry also at the University of Florida.  (Tr. 193-194). He is board certified by the American Board of Psychiatry and Neurology. (Tr. 194).  He is board certified in general and forensic psychiatry and has extensive experience in neurology.  (Tr. 194).  He is currently on the clinical faculty at the University of Florida, where he teaches schizophrenia and thought disorders, and teaches malingering to forensic fellows at the University.  (Tr. 195).  He was formerly the medical director at the North Florida Evaluation and Treatment Center for two and a half years, which is a 217-bed, all men's forensic facility where individuals who are found incompetent to proceed in state court and not guilty by reason of insanity are sent.  (Tr. 196-197).  He then went into private practice in forensic psychiatry and cognitive neurology in 1998 and has been in private practice ever since.  (Tr. 197).

competent to stand trial.  Based on this report and the stipulations of the Parties, the Court committed

Derisma to the custody of the Attorney General for hospitalization and treatment in a suitable facility

for such a reasonable period of time, not to exceed four (4) months, as was necessary to determine

whether there is a substantial probability that in the foreseeable future Derisma would attain the

capacity to permit the proceedings to go forward.[4]  (Doc. #89).

---

[4]When Dr. Waldman evaluated Defendant on March 17, 2010, he did so at the Lee County Jail infirmary unit.  (Tr. 30).  Defendant was receiving intravenous drugs for treatment of his brain abscesses.  (Tr. 204-05).  He had recently returned to the jail from the hospital where he had a craniotomy and neurosurgery in January 2010.  (Tr. 205).  Dr. Waldman conducted higher cortical functioning tests on Defendant at that time.  (Tr. 249-56).  He testified that Defendant exhibited frontal lobe abnormality, language dysfunction, word finding difficulties, and paraphasic errors where he would say a word and it would not come out like he wanted it to sound.  (Tr. 241).  He had orientation and memory problems and an inability to do complex motor tasks.  (Tr. 242).  During this evaluation, Defendant was unable to write down simple words and could not write a sentence about the weather when asked to do so, nor could he draw a clock face.  (Tr. 245-46,249-52).  Dr. Waldman testified that the way that the Defendant drew the clock face (all numbers on the right side and the left side blank) indicated that Defendant suffered from a posterior non-dominant parietal lesion.  (Tr. 249-51).  From the higher cortical functioning tests, Dr. Waldman also concluded that Defendant suffered from frontal lobe impairments, or "complete echopraxia." (Tr. 253).  Dr. Waldman opined that Defendant suffered from delirium during his January 2010 illness, caused by the nocardia brain abscesses in two areas of his brain, which resulted in nocardia sepsis.  (Tr. 225).  This is what brought him into the hospital in January 2010.  (Tr. 226).

With regard to Defendant's January 2010 illness and surgery, at that time, Defendant was suffering from nocardia brain abscesses which caused at least four seizures in Lee County Jail.  (Tr. 229).  Defendant was taken and admitted to the Lee Memorial Hospital in January 2010, and given an MRI of the head and chest.  (Def. Ex. 13).  Dr. Waldman testified that this MRI showed two lesions in the brain and a mass effect, which he described as pressure on the brain resulting in decreased blood flow, resulting in damage to areas of the brain.  (Tr. 234).  This is significant because it caused "neuronal death" in different parts of the brain, which caused Defendant's dementia, which Dr. Waldman believes that Defendant currently suffers from.  (Tr. 234).  A CT scan right around this time showed Defendant had lesions with fluid around the lesions on his brain.  (Tr. 237).

After Defendant was sent to the Butner facility and returned to the Lee County Jail, Dr. Waldman was asked to re-evaluate him.  (Tr. 212).  Prior to his re-evaluation, Dr. Waldman reviewed the Butner report.  (Tr. 212).  He believes that the Defendant's HIV infection has deteriorated to the point that the Defendant now suffers from AIDS.  (Tr. 213).

When Dr. Waldman re-evaluated Defendant again in January 2011 - after he returned from Butner - Defendant committed paraphrasic errors, such as saying "resipitation" instead of "representation."  (Tr. 328, 345).  And the prosecuting attorney was there to protect the law of conviction.  (Tr. 328).  And that one of the pleas is "variable by sanity."  (Tr. 329).  When speaking of the incident, he also stated that he "was wanted for driving,"[5] which Dr. Waldman opined is an example of anomic aphasia.  (Tr. 329).  He did not mention to Dr. Waldman that he was charged with cocaine possession.  (Tr. 329-30).

---

[5]The facts alleged are that on July 29, 2009, at approximately 12:11 a.m., a police officer with the Lee County Sheriff's Office observed a Jeep vehicle traveling on Bayshore Road in North Fort Myers, Florida without its tail lights illuminated.  The officer was driving a marked patrol car, and activated her emergency lights and conducted a traffic stop on the vehicle.  The vehicle was occupied by the driver, a white female named Kristy Pastore, and a black male passenger, Defendant, James Derisma, who was not wearing his required seat belt.  The deputy asked Derisma for his identification and began to issue him a warning citation for the seatbelt violation.  A records check on Derisma indicated that he had an outstanding misdemeanor warrant for failure to appear for a traffic offense, driving while license suspended.  Defendant was subsequently arrested.  The vehicle was a Budget rental vehicle, which was rented by Defendant's mother.  The driver Pastore was not listed on the rental agreement.  The officer called in other officers, who searched and subsequently towed the vehicle for safekeeping since the rental contract stated: "No additional drivers are authorized or permitted to drive without Budget's prior written approval."  During the inventory search, the officer smelled fabric softener, and observed a black shaving bag on the rear seat.  A search of that black bag revealed one thousand sixty eight (1068) grams of suspect cocaine.

The Court notes that paraphasic errors, or difficulty finding the exact word that Defendant is trying to say, would not preclude Defendant from assisting in his defense.  It has been shown that Defendant says a word similar to the word he is trying to think of or he eventually can get to the word with the help of the person he is speaking with.  (241-42).  Defendant can work with his attorney through the events surrounding this case and he can consult with his lawyer to a "reasonable degree of rational understanding."

Dr. Waldman's February 2011 report indicates that Defendant denied having any memory of being stopped by law enforcement in regard to this case.  (Tr. 361-362).  After his reports were completed, Dr. Waldman read and/or listened to emails and phone calls made by the Defendant, all of which were admitted into evidence at the hearing.  (Tr. 322,383).  Dr. Waldman testified that nothing in those materials changed his opinion that Defendant is incompetent to stand trial.  (Tr. 383).  Based on one recorded phone call that Defendant made while he was at Lee County Jail, Dr. Waldman noted that Defendant's thoughts were disorganized, incoherent, and Defendant committed numerous paraphrasic errors where he says words that sounded kind of like the word he was thinking of.  (Tr. 326-29).  But this was only one phone call, and the Court's review of numerous others evidence clear thinking and planning, as in an October 2010 call where Defendant was expressing to a caller that he did not know what he wanted to do - whether he wanted to take his case to trial or just take the time and get it over with.  (Govt. Ex. #3, 34742018_Oct 07_2010_13_14_42_PM_2396034321).

It is Dr. Waldman's opinion that Defendant currently suffers from dementia, which he described as the process of a decline in one's thinking abilities, one's reasoning abilities, that is accompanied by abnormalities of speech, complex motor tasks, abnormalities in writing, and

calculation functioning.  (Tr. 226).  Dementia is any process which causes a permanent decline in one's cognitive functioning.  (Tr. 226).  Dr. Waldman attributes Defendant's dementia to the nocardia abscesses, which did damage to his brain and caused pressure on his brain.  (Tr. 226-27). Damage from the abscesses have been done to the frontal lobe, which is the part of the brain that would be used for making decision on whether to go to trial, whether to plead, whether to waive a motion to suppress, and judgment.  (Tr. 226-27, 293).

Dr. Waldman believes that Defendant has a "dementing process" occurring in his brain as a result of the lesions, the infections in his brain, and AIDS, such that he believes his intelligent quotient has been going down for the past three years.  (Tr. 239).  Dr. Waldman testified that Defendant suffers from permanent brain damage, mostly due to the lesions, the nocardia, and also the fact that he has AIDS.  (Tr. 256-57).

Defense presented numerous medical records during the hearing to show that Defendant was not malingering.  (Tr. 256,267,297,310-12,316,331-34).  Dr. Waldman discussed the Butner report and its findings, and opined that Butner is incorrect to state that Defendant does not suffer from a major mental illness.  (Tr. 332-33).  Rather, Defendant suffers from the mental disease of dementia due to other general medical conditions, the criteria for which is the development of multiple cognitive deficits, memory impairment, inability to learn new or previously learned information, and Defendant suffers from "anterior grade memory dysfunction," which means that he cannot log new memories.  (Tr. 307-08).  While it was Butner's finding that Defendant was malingering while he was at the facility, Dr. Waldman testifies that he has never witnessed Defendant malingering.  (Tr. 310).  Dr. Waldman testified that he was trained to and always starts out skeptical with a forensic evaluation.  (Tr. 211).  And as he has been recognized as an expert in malingering, he believes that

he would be able to tell if the Defendant was malingering at any time.  (Tr. 212).  When Dr. Waldman spoke with Defendant about being at Butner, Defendant told the doctor that the police questioned him at Butner, rather than doctors.  (Tr. 311).  Dr. Waldman believes that the Butner report does not take into account Defendant's "catastrophic brain infection," which he nearly died from in January 2010.  (Tr. 331-32).

It is Dr. Waldman's opinion that Derisma remains incompetent to stand trial (Tr. 214), and he believes that Defendant's incompetence will continue based on the fact that Defendant has irreversible brain damage, with a diagnosis of dementia that is not going to improve.  (Tr. 344).  Dr. Waldman also opined that he has extreme difficulties with anterior grade memory, taking in new information and remembering some older information.  (Tr. 344).  He has difficulty with language processing, and he has word-finding difficulties, as a consequence of which Defendant is and will continue to be incompetent to stand trial and is "non-restorable."  (Tr. 344).  Dr. Waldman believes that Defendant's biggest problem is his inability to assist in his own defense because of his severe anterior grade amnesia and his severe language deficits.  (Tr. 391).  Because of this, Dr. Waldman believes that Defendant has and will continue to have significant problems with assisting his attorney in his own defense and believes Defendant is not restorable.  (Tr. 344).  In coming to this opinion, Dr. Waldman relied in part upon the observation that the MRI taken in June 2010 is somewhat worse than the MRI taken in January and February 2010.  (Tr. 654).  The amount of tissue loss is significant in remote areas.  (Tr. 654).  Dr. Waldman believes the Defendant could have an ongoing HIV-related process which is causing parenchymal loss.  (Tr. 654).

Although the Court does not doubt and agrees with Defendant's experts that Defendant suffers from a mental disease or defect as a result of his January 2010 illness and resulting

craniotomy, and will continue to have brain damage and disease processes as a result of the progression of his AIDS, the Court notes that Defendant appears to have the present ability to cope with his ailments and speak with his family and friends, shows concern and compassion for them, is interested in keeping up with events occurring outside the jail, and expresses frustration with the progression of his legal case.  Notably, the Defendant gave comprehensible and coherent parental advice to his family over the telephone in February 2011.  (Govt. Ex. #4, 021411 2132).  In May 2010 (after Defendant's January 2010 illness and surgery) he stated to a caller that he was meeting with his lawyer about a competency hearing and that his co-defendant had already taken responsibility for her actions, and got five years.  (Govt. Ex. #4, 050410 1239).  In May 2010, Defendant knew what offense constitutes a felony and was planning to buy his friend a car.  (Govt. Ex. #4, 051310 1543).  In October 2010, Defendant was expressing to a caller that he did not know what he wanted to do - whether he wanted to take his case to trial or just take the time and get it over with.  (Govt. Ex. #3, 34742018_Oct_07_2010_13_14_42_PM_2396034321).

*Government Expert Dr. Carlton T. Pyant, Ph.D.*

Dr. Carlton T. Pyant is a forensic psychologist at Butner.  (Tr. 403).  At Butner he generally conducts competency evaluations, criminal responsibility evaluations, and dangerousness evaluations.  (Tr. 403-04).  The  Court admitted Dr. Pyant as an expert in the area of forensic psychology without objection by the defense.[6]  (Tr. 404).

---

[6]Dr. Pyant obtained his bachelor's degree in 1981 at North Carolina Central University in psychology.  (Tr. 403).  He received a master's degree from Southern Illinois University in 1984.  (Tr. 403).  He then received his Ph.D. in 1989, also from Southern Illinois University.  (Tr. 403).  He worked with the Army as a psychologist from 1985 to 1991.  (Tr. 403).  He has been employed as a forensic psychologist at Butner since October 2000.  (Tr. 403).

Defendant was sent to FMC Butner for evaluation and observation for a period of four months, arriving on June 7, 2010. (Tr. 407). Defendant was housed in Butner's mental health unit and was never in an infirmary or medical-type unit. (Tr. 407-09). When Defendant was first interviewed by Dr. Pyant on June 8, 2010, he reported an inability to state the month, day, or year. (Tr. 411). Nor could he name the geographic location of the state he was in, or the name of his wife. (Tr. 411-13). He also reported an inability to state the number of siblings he has. (Tr. 412). He also claimed an inability to know what the word "children" meant and claimed he did not have any children. (Tr. 413). Dr. Pyant testified that this first interview was quite atypical given that Defendant did not know simple, overlearned materials, such as the name of his wife. (Tr. 414). Dr. Pyant next met with the Defendant on June 10, 2010, accompanied by a psychiatrist and a social worker to talk to him about the nature and purpose of their evaluation. (Tr. 415). At that time, Defendant was given the opportunity to express any concerns that he may have had. (Tr. 415).

The Defendant met with a social worker at Butner on June 15, 2010, during which the social worker conducted a psychological assessment. (Tr. 420,422). The social worker interviewed him and Defendant was able to name his wife and her phone number, he provided the city and state he was in, he recalled the name of his mother and provided her address, he reported he had children but he did not know their ages or how many children he had, and that he could not recall anything about his childhood. (Tr. 422). He reported that he had HIV and seizure disorders. (Tr. 422). He reported that he took special education classes but that he could read and write a little. (Tr. 422).

Dr. Pyant reviewed recordings of phone calls made by the Defendant from Butner and also calls made by Defendant from Lee County Jail in making his findings, which pertains to the issue of memory and cognitive functioning. (Tr. 423,426,433). He was listening to these phone

conversations throughout the time that he was evaluating the Defendant.  (Tr. 433-34).  Dr. Pyant listened to a June 18, 2010 phone call with Defendant's wife during which Defendant told his wife that he was in a prison hospital located on "Old 75," and he asked about his children whom he spoke with on the call.  (Tr. 427-28).  Dr. Pyant noted that he was upbeat, his speech was coherent, logical, organized, and he had no problem with word retrieval.  (Tr. 428-29).  Dr. Pyant testified about other phone calls placed by the Defendant during his stay at Butner from October 7, 2010 to October 24, 2010, as well as the phone calls placed by the Defendant while in the Lee County Jail.  (Tr. 423-34).

A May 4, 2010 phone call took place before the Defendant arrived at Butner.  (Tr. 465).  Dr. Pyant stated that the Defendant, in the telephone call, displayed no sign of memory impairment, had coherent speech, communicated in a concise way, and could describe his surroundings.  (Tr. 465-66).  A May 25, 2010 phone call took place from the Lee County Jail.  (Tr. 466).  Dr. Pyant stated that the Defendant discussed his charges, the possibility of having to stand trial, and mentioned the terms "guilty," "not guilty," and "incompetent."  (Tr. 466).  The October 7, 2010 phone call took place from Butner.  (Tr. 467).  Dr. Pyant stated that the Defendant was alert, calm, and referencing his charges and the importance of communication with his (the Defendant's) attorney.  (Tr. 466).  Dr. Pyant did not see any indication that the Defendant displayed any difficulty understanding that there are charges against him.  (Tr. 467).  The phone calls suggested that the Defendant was involved in his case, asking for relevant questions, and was familiar with information that is consistent with the police reports.  (Tr. 477).

Dr. Pyant testified that he also used emails sent by the Defendant during his stay in Butner in reaching his opinion.  (Tr. 468).  Dr. Pyant used an email sent on November 7, 2010 to form the opinion that the Defendant was able to recognize that he has a medical condition.  (Tr. 470-71).  An

email sent on November 4, 2010 was used by Dr. Pyant to conclude that the Defendant demonstrated an investment in the court proceedings by asking for information that would help him in the decision-making process.  (Tr. 473).  An email sent on November 1, 2010 referenced "Acorn Storage," where the Defendant was arrested.  (Tr. 473-75).  Dr. Pyant pointed out that the Defendant was referencing information related to his alleged offense, as well as the ability to recall the name of the storage facility owner.[7]  (Tr. 474-75).

The next meeting Dr. Pyant had with Defendant was on July 1, 2010.  (Tr. 429).  At that meeting, Defendant reported an inability to remember his mother's name, the names of his two children, or the first name of his wife.  (Tr. 429).  Dr. Pyant then met with him again on July 26, 2010.  (Tr. 430).  At that meeting, Defendant reported that he remembered the name of his mother and wife, but he did not know what year comes after 2010.  (Tr. 430).  The Court notes that Defendant's communications in the emails and phone calls does not comport with how Defendant presented himself to the Butner team.

Dr. Pyant next met with the Defendant on August 21, 2010.  (Tr. 431).  At that meeting,

_____

[7]The facts of this case indicate that at the time officers conducted an inventory search of the vehicle after Derisma was arrested they located a storage receipt from Acorn Self Storage at 337 NE Pine Island Road, Cape Coral, Florida in the name of Marion Gaskins who it was subsequently revealed was Derisma's wife.  Police subsequently conducted a free air sniff of the units at Acorn Self Storage, which alerted to the presence of narcotics at Unit #227.  Detectives executed a search warrant on that unit. The unit contained large amounts of cash and paperwork with Defendant's street name "Zoe" on them.  The owner of the Acorn Storage facility stated to officers that the name of the individual who rents the unit also rented two other units and was named "Kenny Joseph."  Officers showed the owner a single digital photograph of Derisma at which time the owner identified him as the subject he knew as "Kenny Joseph."  The owner stated that Derisma frequented the storage facility and usually paid for both units.  During the time the search warrant was being executed, Derisma arrived at the unit and was arrested. (Complaint, Doc. #1).

Defendant reported that he had conversed with his wife but claimed an inability to recall anything about the conversation.  (Tr. 432).  He correctly identified the year, but not the month.  (Tr. 432).  He said he did not know the current city or the state or the institution where he was located and could not remember the number of children he had fathered or the extent of his education.  (Tr. 432).  During that meeting he conducted the TOMM or Test of Memory Malingering on Defendant, which indicated that Defendant was malingering.[8]  (Tr. 438-42).  Dr. Pyant also conducted the Validity Indicator Profile (VIP) test on September 22, 2010, on Defendant.  (Tr. 442).  Defendant was administered both the verbal and nonverbal portion of the test, and the results suggested a suppressed response style, meaning that he was deliberately choosing incorrect answers over correct ones.  (Tr. 422).  Next, Dr. Pyant administered the Personality Assessment Inventory (PAI) on September 22, 2010. (Tr. 442).  This test's scoring revealed to Dr. Pyant that Defendant was deliberately attempting to make himself look psychologically ill.  (Tr. 442).

The Defendant next met with Dr. Pyant on September 28, 2010.  (Tr. 434).  At this meeting, Defendant claimed that he did not know what a week was, what a horse was, or the number of legs a horse has.  (Tr. 434-35).  When the doctor started to ask Defendant what the judge, attorney, and prosecutor do, he stated that he did not want to answer questions anymore and asked to go back to bed.  (Tr. 435).  At that point the meeting ended.  (Tr. 435).  Dr. Pyant believed that Defendant was not being truthful during that meeting.  (Tr. 435).  It is not clear whether Dr. Pyant ever asked Defendant any legal-related questions again.

Dr. Pyant noted in his evaluation that Defendant had a significant criminal history, which he

---

[8]There is essentially no dispute that Defendant was not cooperating in the testing at Butner.  Defense has argued that this was due to the fact that Defendant perceived Butner as a hostile environment and chose not to cooperate.

believed started in 1995, and that Defendant had been arrested over eighteen (18) times.  (Tr. 436).

Dr. Pyant thought there were deliberate attempts at deception by Defendant and that he did not put

forth any effort during the evaluations.  (Tr. 438).  The Court notes that Defendant has undoubtedly

become familiar with the criminal justice process as he has had at least eighteen prior contacts with

the system.

Dr. Pyant discussed the Defendant's 110 phone calls as a significant showing that the

Defendant is not impaired.  (Tr. 476).  The "goal directed activity of making telephone calls"

requires having a PAC and PIN number.  (Tr. 476).  The PIN is a four digit number, and the PAC

is a nine digit number.  (Tr. 476).  In order to send an email, an inmate is required to enter a PAC

number, PIN number, and additional information in order to access the system.  (Tr. 476-77).  Dr.

Pyant categorized both the telephone calls and the emails as a "goal directed activity" which did not

support evidence of impairment.  (Tr. 476-77).  Dr. Pyant testified that even if the numbers were

written down, the fact that the Defendant was able to recall where the papers were stored is not

consistent with memory impairment.  (Tr. 477).  The Court reviewed all of the phone calls

introduced into evidence and finds they are not consistent with a Defendant who is competent to

stand trial.

In order to reach his opinion about the Defendant's memory impairment, Dr. Pyant also relied

on other pieces of data available to him, including the observations and collateral data from other

staff members.  (Tr. 405-06,578).  The process of receiving medication at Butner consisted of the

inmates acting on their own accord to retrieve their medication.  (Tr. 447).  Dr. Pyant testified that

there were no reports from the nurses that the Defendant did not retrieve his medication.  (Tr. 447).

The Defendant was also able to make and remember appointments with his treating doctors, as well

as locate their office (some of which were located in a different unit as the Defendant). (Tr. 478-79).

Dr. Pyant diagnosed the Defendant as malingering. (Tr. 479). The DSM (diagnostic and statistical manual) defines malingering as the intentional production of false or grossly exaggerated physical or psychological symptoms, typically for secondary gain such as avoiding criminal prosecution. (Tr. 480). Dr. Pyant did not inform the Defendant of this diagnosis. (Tr. 480). He stated that there was no benefit in telling the Defendant of the diagnosis, and also that informing patients of such a diagnosis will result in an actual management problem from the inmate spawning from an increase in exaggerated symptoms. (Tr. 480).

After reviewing the post-Butner reports of Dr. Waldman and Dr. Einstein, Dr. Pyant noted a dramatic increase in the Defendant's performance on his TOMM with defense experts. (Tr. 481). He opined that the Defendant understood now that he needed to cooperate with the defense doctors. (Tr. 481-82). Dr. Pyant noted that the Defendant could have just been responding to the difference between a doctor viewed as adversarial and a doctor viewed as his advocate. (Tr. 513-15).

Dr. Pyant did not see any indication of delirium, which Dr. Waldman's report pre-Butner indicated, during the Defendant's four month stay at Butner. (Tr. 482). After reviewing the post-Butner reports of Dr. Waldman and Dr. Eisenstein, Dr. Pyant did not see any indication that the Defendant ever presented aphasia or memory impairment. (Tr. 482). In coming to this conclusion, Dr. Pyant randomly listened to portions of phone calls made by the Defendant. (Tr. 482). Dr. Pyant concluded that the Defendant was not aphasic, did not find any evidence of apraxia, and was not demented. (Tr. 482-83). Dr. Pyant testified that based on his four-month assessment of the Defendant that, in his expert opinion, Defendant is competent. (Tr. 483-84). He could not find any evidence that the Defendant suffers from a severe mental disease or defect. (Tr. 484).

Dr. Pyant testified that he did not refer Defendant for neuropsychological testing because that testing focuses on deficits and in his experience does not assist the Court in determining whether a person is competent. (Tr. 501-03). Also, Dr. Pyant did not see any functional signs of impairment to discuss with a neuropsychologist. (Tr. 447). Dr. Pyant did not see any significant impairment in Defendant's day-to-day functioning that Dr. Pyant would expect based on the scores that Defendant obtained on Dr. Eisenstein's neuropsychological testing. (Tr. 446-48). Defendant did not have trouble navigating around the hospital, using email, or using the telephone. (Tr. 447). Dr. Eisenstein's report is not consistent with what Dr. Pyant and his staff observed on a daily basis with the Defendant. (Tr. 448).

*Government Expert Dr. Kwanna Williamson, M.D.*

Dr. Kwanna Williamson, M.D. is a staff psychiatrist at Butner. (Tr. 580). She began working at Butner in July 2008. (Tr. 582). Dr. Williamson's duties at Butner include completion of psychiatric diagnostic assessments, providing psychiatric consultations, completing court ordered forensic evaluations for competency criminal responsibility, and risk of dangerousness assessments. (Tr. 582). She also provides psychiatric treatment and management for individuals who are sentenced, committed, and/or are pretrial. (Tr. 582). The defense had no objection, and the Court admitted Dr. Williamson as an expert in the field of general psychiatry.[9] (Tr. 582-83).

Over the course of the Defendant's four-month stay at Butner, Dr. Williamson spent less then

---

[9]Dr. Williamson also has a clinical practice, outside the scope of her responsibilities at the Bureau of Prisons. (Tr. 606). She received her bachelor's degree in nursing from the University of North Carolina in Chapel Hill in 1987. (Tr. 581). Dr. Williamson received her medical degree from the University of North Carolina Chapel Hill in 2004. (Tr. 582). She completed her internship at Harvard McLean Psychiatry Program in 2005, and completed her residency at the University of North Carolina in Chapel Hill in 2008. (Tr. 582).

two hours face to face with the Defendant, and approximately four hours evaluating medical records. (Tr. 630,631).  Dr. Williamson first encountered the Defendant the day after his initial arrival.  (Tr. 583).  She was the psychiatrist assigned to the Defendant.  (Tr. 583).  Noticing the Defendant's medical history and lack of collateral information, Dr. Williamson made a recommendation to try to obtain collateral records and ensured that the medical team at Butner knew of the Defendant's HIV diagnosis.  (Tr. 584).  Dr. Williamson noted that standard admission practice at Butner is for all inmates to have a physical exam and baseline admission laboratory studies.  (Tr. 584).  An MRI was ordered for the Defendant since he had had surgery prior to admission.  (Tr. 584).  Dr. Williamson noted that the Defendant appeared to be clinically stable on observation, and that his physical examination did not have any acute findings.  (Tr. 584).

Dr. Williamson noted that her initial meeting with the Defendant was a joint interview with Dr. Pyant.  (Tr. 589).  During the meeting, the Defendant did not appear in any acute distress.  (Tr. 589).  The Defendant appeared to be answering the questions to the best of his ability.  (Tr. 589). Dr. Williamson believed the Defendant's description of a brain injury or brain surgery to be as descriptive as expected.  (Tr. 589).  The Defendant also informed Dr. Williamson that he had two "balls" in his head that were removed, which was later confirmed to be two abscesses.  (Tr. 589-90).

The Defendant denied any past mental health history.  (Tr. 591).  He also denied any symptoms of depression.  (Tr. 591).  Dr. Williamson found the Defendant's language to be understandable during the interview, and there was no evidence of thought blocking.  (Tr. 591). There was latency of speech observable at times.  (Tr. 591).  The Defendant's eye contact during the meeting was described as fair and he was well groomed, with appropriate hygiene.  (Tr. 591).  There were no abnormal movements and the Defendant was cooperative.  (Tr. 591).

There was an MRI conducted at Butner on June 14, 2010. (Tr. 592). The results were consistent with post-surgical changes. (Tr. 592). Dr. Williamson found the MRI results to indicate that the Defendant was medically stable, with no evidence of new findings or an acute finding on the imaging. (Tr. 593). After the MRI, the medical team followed up with the Defendant and managed him for his HIV/AIDS. (Tr. 593). The MRI results did not show the need for any other medical intervention. (Tr. 593).

A neurologist did not evaluate the Defendant while he was at Butner. (Tr. 593-94). Dr. Williamson stated that there was no need for such an evaluation because there were no overt neurological findings which would require a neurologist. (Tr. 594). There were no signs of any abnormalities of his gait, no abnormal movements, no disorientation, and no evidence of acute delirium; if there were signs of any of the preceding, a neurological evaluation would have been warranted. (Tr. 594).

Dr. Williamson noted that at the time she evaluated the Defendant, he no longer presented in a delirious state. (Tr. 597). It appeared that the surgical intervention and treatment with IV antibiotics for his brain abscesses were successful. (Tr. 597). There was no evidence of recurrent or an acute relapse when Dr. Williamson evaluated the Defendant. (Tr. 597). The Defendant did not appear to have delirium or aphasia during his time at Butner. (Tr. 597).

Dr. Williamson indicated that she did not render an opinion on the Defendant's competency. (Tr. 620). Dr. Williamson also stated that she concurred with her colleague, Dr. Pyant and his findings. (Tr. 620). When asked whether she saw any symptoms that would lead her to believe that Defendant's abilities were affected in any way by his brain injury, she stated that there were no notable deficits during her interactions with him, but looking at "collateral information at varying

time points there appear to be some deficits, but there's no evidence of severe impairment." (Tr. 631). She stated this was based on Defendant's medical records that she reviewed. (Tr. 631-32). She observed no notable deficits in the Defendant as a result of his brain injury. (Tr. 631).

## Discussion

In this case, Defendant argues that his dementia prevents him from assisting his attorney in presenting his defense. Specifically, it was argued at the hearing that he does not remember certain events and has difficulty piecing together events in his life, including the events surrounding the charges in this case. Further, it was argued that he cannot engage in decision making such that he could decide whether to take a plea in this case or go to trial. Defendant presented two experts in support of his contentions. Both defense experts concluded that Defendant suffers from a mental disease or defect - dementia - which renders him incompetent to stand trial. Dr. Eisenstein opined that his restoration is questionable, while Dr. Waldman believes that he is non-restorable. On the other hand, Government experts Drs. Pyant and Williamson had the chance to observe Defendant at Butner for four months, read his emails and listen to his phone calls, and Dr. Pyant evaluated Defendant on a number of occasions during which Defendant did not cooperate. Although Dr. Pyant agrees that Defendant suffers from a mental disease or defect, he does not believe that it renders him incompetent to stand trial.

The Court points to excerpts from the significant number of phone calls the Defendant made to assist in determining whether Defendant is competent to stand trial. Notably, the Defendant gave comprehensible and coherent parental advice to his family over the telephone in February 2011. (Govt. Ex. #4, 021411 2132). In May 2010 (after Defendant's January 2010 illness and surgery) he stated to a caller that he was meeting with his lawyer about a competency hearing and that his co-

defendant had already taken responsibility for her actions, and got five years.  (Govt. Ex. #4, 050410 1239).  In May 2010, Defendant knew what offense constitutes a felony and was planning to buy his friend a car.  (Govt. Ex. #4, 051310 1543).  In October 2010, Defendant was expressing to a caller that he did not know what he wanted to do - whether he wanted to take his case to trial or just take the time and get it over with.  (Govt. Ex. #3, 34742018_Oct_07_2010_13_14_42_PM_2396034321).  In that call, he noted that he will let his lawyer handle that, but if his lawyer was a public defender, then the Defendant would make the decisions.  Id.

The conduct of Defendant as observed by the officials at Butner and from what the Court read and listened to in Defendant's emails and phone calls, which took place after Defendant's surgery and recovery, does not correspond to the assessment of a defendant who is not capable of assisting in his defense.  The Court also observed Defendant's behavior in the courtroom over the three-day hearing.  Defendant's behavior was appropriate, and he was engaged and attentive throughout the proceedings.  Though Defendant suffers from brain damage and resulting dementia, he is not debilitated by these processes to the extent he cannot stand trial.  There has been no evidence presented to this Court that Defendant's memories are irretrievable or forever lost such that no review of documents or other evidence in this case would assist him in formulating his defense with his attorney.  "It must be recognized that it does not violate due process to proceed against a man who suffers from physical or mental ailments as long as he still has the capacity to consult with his attorney and understand the proceedings."  Markis, 535 F.3d at 909.

Thus, based upon the testimony and exhibits presented to the Court, along with a consideration of the expert's reports and their observations of the Defendant, the Court concludes under a totality of the circumstances and respectfully recommends that the Defendant is competent

to stand trial.

Accordingly, it is now

**RESPECTFULLY RECOMMENDED:**

 The Court enter an Order finding that Defendant James Derisma is **COMPETENT** to stand

trial as he is able to understand the nature and consequences of the proceedings against him and able

to assist properly in his defense.

Failure to file written objections to the proposed findings and recommendations contained

in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from

attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this  27th   day of June, 2011.


SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE


Copies: All Parties of Record