# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION


UNITED STATES OF AMERICA

-vs-                                                            Case No.:   2:09-cr-64-FtM-29SPC

JAMES DERISMA

_____


## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

　　This matter comes before the Court on Defendant's Amended Motion to Suppress and Exclude Statements of Defendant (Doc. # 216) filed on November 28, 2011.   The Government filed its Response to Defendant's Amended Motion to Suppress and Exclude Statements of the Defendant (Doc. # 224) filed on December 5, 2011.   The Court held a the first segment of a bifurcated hearing on the instant Motion on December 14, 2011, during which time the Court heard testimony from Deputy Steven Sutphin.[1]   The Court held the second segment of the bifurcated hearing on January 23, 2012, during which time the Court heard testimony from Dr. Alan Waldman and argument from counsel for both parties.[2]   The Defendant was present at both hearings and represented by retained counsel, David Brener.   The Government was represented by Assistant United States Attorney Tama Caldarone during the first hearing, and Assistant United States Attorneys Tama Caldarone and Douglas Molloy during the second hearing.   The issues raised in the Defendant's Motion to Suppress are now ripe for review.

---

[1]  Excerpts from the first hearing transcript will be referred to as Tr. p.
[2]  Excerpts from the second hearing transcript will be referred to as Tr. II, p.

## BACKGROUND

On August 19, 2010, the Grand Jury returned a two-count Indictment against Defendants James Derisma. Defendant Derisma is charged with Count I, possession with intent to distribute more than 5 grams of a mixture or substance containing a detectable amount of cocaine base, known as crack cocaine, and Count II, possession with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine. (Indictment, Doc. # 10). Defendant Derisma was the passenger in a vehicle which was stopped for a defective headlight violation. A subsequent search of the vehicle revealed cocaine. The Defendant was subsequently arrested as a result of drugs located during the execution of search warrants at a storage facility.

In December 2009, while incarcerated at the Lee County Jail, Defendant was admitted to Lee Memorial Hospital due to observed seizures. It was subsequently determined Defendant suffered from nocardia infection due to the AIDS virus ultimately resulting in abscesses in his brain. Consequently, Defendant underwent brain surgery and medication therapy and was prescribed antibiotics, anti-seizure, and pain medication. As the Defendant remained in custody at Lee Memorial Hospital (LMH), he was guarded at all times by a law enforcement officer. Specifically, at all times relevant to this Motion, on January 20, 21, 31, and February 3, 4, and 8, 2010, Deputy Sutphin of the Lee County Sheriff's Office guarded the Defendant.. This time frame covered before, during, and after Defendant's brain surgery.

## TESTIMONY

*Deputy Steven Michael Sutphin (Doc. # 246; Tr. 4-74)*

Deputy Steven Michael Sutphin (Deputy Sutphin) is employed with the Lee County Sheriff's Office (LCSO) as a patrol deputy in the North District and has served in that capacity for

five (5) years. (Tr. 4).[3]   During the time in question, Deputy Sutphin was part of an extra-duty detail.[4]   In early 2010, he accepted a detail at the hospital to monitor James Derisma. (Tr. 6). Deputy Sutphin monitored Defendant at the hospital for six (6), twelve (12) hour shifts. (Tr. 6). The Deputy stated that he was working 'detail' at LMH, guarding Defendant before, during, and after his brain surgery. (Tr. 13).   Deputy Sutphin testified that he did not write a report describing his conversations with Derisma after his detail and he was not present at the hospital to interrogate the Defendant, only to supervise his admittance. (Tr. 10-11).   However, Deputy Sutphin testified that he told Detective Armado and Detective Snyder from the narcotics division about the conversations between them several times throughout his detail in order to pass along information that Defendant had given him about narcotics activities in North Fort Myers. (Tr. 11).   Deputy Sutphin also noted that Defendant was "up all night, and slept all day, except for the one day he was unconscious due to his surgery." (Tr. 13).

While at LMH, Deputy Sutphin asked the Defendant questions about his drug activities, Haiti, and the Defendant's family, but stated that he gave no Miranda warnings because he was not questioning the Defendant about this case, and was only asking questions to "keep the conversation going." (Tr. 13-14).   Deputy Sutphin stated that he and Defendant had conversations before and after the surgery, but Defendant talked specifically about this case towards the end of his hospital stay. (Tr. 16).   The nature of their conversation was friendly (Tr. 21), and Deputy Sutphin testified that if Defendant "made a statement, [he] might ask Derisma to clarify what he said, or state 'What do you mean by that?'" (Tr. 22).

---

[3] Deputy Sutphin graduated from the police academy and was a military police sergeant before working for the LCSO. He has taken several incentive courses on narcotics. (Tr. 4-5).

[4] Extra-duty hours are paid for by a vendor, rather than the sheriff's office. They are typically paid at a rate of $30 an hour. (Tr. 6).

On cross-examination, Deputy Sutphin stated that he and other LCSO's had been attempting to arrest Defendant, a known drug dealer, since 2008, but were unable to do so. (Tr. 26).   After requesting this detail, Deputy Sutphin stated that he monitored Defendant on January 20, 21, 31, and February 3, 4, and 8, 2010. (Tr. 27-29).   Deputy Sutphin further testified that he met with the United States Attorney's Office on October 6, 2011, almost two years after he supervised Defendant during his hospital admittance. (Tr. 30).   He stated that during his meeting with Assistant U.S. Attorney Tama Calderone (AUSA Calderone) and Case Agent Rafael Rodrigo (Agt. Rodrigo), he informed them he had worked several shifts of overtime during January/February at which time he had spoken to Derisma.   He indicated to them that he could not recall which statements Derisma made on which days during his detail. (Tr. 34).[5]   However, Deputy Sutphin was able to recall that statements about this case were made "after surgery." (Tr. 39).   Deputy Sutphin testified that Defendant was "no more or less lucid at the end of the detail than he was at the beginning of the detail, other than the day that he had the surgery." (Tr. 40).

During his testimony, Deputy Sutphin confirmed he was aware that the surgery was performed because Defendant had abscesses to his brain due to an almost fatal myocardial infection [sic], and had serious medical issues. (Tr. 43).   Deputy Sutphin noted that conversations between himself and Defendant at the hospital would "jump around" and began when he started his detail and continued until his shift was over. (Tr. 67).   Deputy Sutphin also indicated he asked Defendant to clarify his statements at the time they were made, during the hospital stay. (Tr. 67). The Deputy stated he was aware Defendant was on pain medication at the time of their conversations, however, never observed Defendant hallucinating. (Tr. 70).

---

[5] The purpose of his meeting with AUSA Calderone and Agt. Rodrigo was to prepare for testimony regarding his previous encounter with the Defendant at the Circle K gas station after he was released from custody on the arrest for the traffic stop. (Tr. 37).

On redirect, Deputy Sutphin testified that Dermisma occasionally made statements he could not understand either due to the Defendant's accent or because he was mumbling. (Tr. 73). The Deputy further stated that he had no intent to "do anything" with the Defendant's statements or the information he obtained from the conversations, and only asked questions to clarify statements for continuity of the conversation. (Tr.73). Deputy Sutphin testified that he was not interrogating Defendant and was aware that Defendant was not <u>Mirandized</u>. (Tr. 72).

### *Dr. Alan J. Waldman, M.D. (Doc. # 245; Tr.II, 11-71)*

On January 23, 2012, Dr. Alan Waldman (Dr. Waldman) testified and was declared an expert witness in general psychiatry, forensic psychiatry, cognitive neurology, and neuropsychiatry.[6] (Tr. II, 11). Dr. Waldman testified that he was provided with a copy of the DEA-6 report of Defendant's alleged statements and the dates the statements were made while Defendant was in LMH. (Tr. II, 14).

Dr. Waldman testified that he initially met with Defendant on March 17, 2010, after his surgery, to do a neuropsychiatric competency evaluation. (Tr. II, 16). Counsel admitted into evidence Dr. Waldman's letter sent to Defense Counsel on March 19, 2010, detailing his preliminary findings. (Def. Ex. #2). The findings stated that Defendant was recovering from two brain abscesses of the bacteria nocardia, one of which was drained surgically. (Tr. II, 17). The other, in Defendant's frontal lobe, was unreachable, and was treated with IV antibiotics. (Tr. II, 18). Dr. Waldman stated when he met with Derisma he was suffering from severe delirium due to his brain infections, which affect all areas of cognitive functioning. (Tr. II, 18). Dr. Waldman

---

[6] Dr. Waldman was previously declared an expert witness in general psychiatry, forensic psychiatry, cognitive neurology, and neuropsychiatry before this Court during his underlying competency hearing on May 26-27, 2011. The Court incorporated Dr. Waldman's prior testimony at Defendant's competency hearing for the purpose of this hearing. (Sealed Transcripts) Further, the Court adopted the exhibits introduced at the competency hearing, including: medical records, MRI reports, EEG, nurse notes, and psychiatric evaluations for the District Court's review. (Tr. II, 12-14).

stated that after Defendant's craniotomy in February, although the posterior abscess was relieved of some pressure and mass effect, he still suffered from delirium. (Tr. II, 19). [7]

Dr. Waldman stated that it was his opinion that Defendant was suffering from a delirious state upon admission to LMH after he had his first seizure. (Tr. II, 21). Derisma's language functions would have been deranged in a delirious individual meaning they will talk about anything and really not have a logical connection between the things that they say. Further the veracity of the things that they say is not reliable. (Tr. II, 21). He reviewed the statements that were noted by the nurses and other records attributed to the Defendant. (Tr. II, 22). After speaking with Defendant's wife for confirmation of some of what the Defendant was saying, Dr. Waldman opined that Defendant's statements were delusional. (Tr. II, 23). Dr. Waldman affirmed that someone suffering from delirium makes statements that may be fanciful or unreliable. (Tr. II, 23).

Dr. Waldman's Report included that a brain mass could cause parenchymal (functional tissue) loss, due to scar tissue that forms which causes empty holes in the brain tissue itself. (Tr. II, 23). He also stated that an infection will eat at the brain tissue, and it will turn the tissue into toxic material which causes the body to go into a state of sepsis. (Tr. II, 24). These conditions existed in Defendant prior to surgery and Defendant was in critical condition when he was admitted. (Tr. II, 24-25). Further, Defendant was suffering from delirium at the time of his conversations with Deputy Sutphin, including both before and after the surgery. (Tr. II, 24-26).

The Court admitted Defendant's medication records during his hospital stay into evidence. (Ex. #'s 4, 5). Defendant's medication regiment included intravenous antibiotics, such as Zithromax and Rocephin in March 2010 when Dr. Waldman saw him to assess his competency.

---

[7] Delirium was defined as a gross impairment of the central nervous system which renders an individual disoriented, and confused on other levels, including: hallucinations, delusions, or fixed false beliefs. (Tr. II, 18).

(Tr. II, 26). In determining whether the Defendant's brain was functioning and whether his medication would preclude him from making a free and voluntary statement, experts use medical records, charts and graphs to render an opinion. (Tr. II, 29). During the time that Derisma allegedly made the statements to Deputy Sutphin, he was on intravenous morphine sulfate which is one of the more potent forms of opiate derivatives given as painkillers. (Tr. II, 31-33). Derisma was also given the option of using oxycodone which is also a painkiller that can cause loss of touch with reality. Opiates produce a euphoric dream state, which is one of the negative side effects of the drug. (Tr. II, 33-34). Derisma was also prescribed Lorazepam which is a benzodiazepine, a minor tranquilizer. (Tr. II 35). Benzodiazepines affect cognition, are disinhibiting, which can cause individuals to say things they otherwise would not say, and can cause individuals to lack judgment and insight into the things that they say. (Tr. II 35-36). Dr. Waldman explained that it does not mean that what is said is not reliable, it just means that the Defendant rambled on about what was in his mind; and what was in his mind was delirious thought, feelings and delusions. There was no or less inhibition because of the Lorazepam to keep those delusions inside. (Tr. II 37). Dr. Waldman testified that under the influence of these pain killers and narcotics, he can opine with reasonable medical certainty that Defendant was disinhibited and could not make a voluntary statement under this condition. (Tr. II, 40).

In his testimony, Dr. Waldman stated that Defendant would have a difficult time understanding the capacity of the situation when confronted by a police officer. (Tr. II, 42-43). He further stated that there is no way Defendant, during his interactions with Deputy Sutphin, could know the officer's true position or what kind of situation he was under. (Tr. II, 44). Dr. Waldman further opined that Defendant was susceptible to the Deputy's trickery and was not able

to recognize follow up questions in regard to trickery. (Tr. II, 45).   In response to a hypothetical, Dr. Waldman stated that under these medication conditions, Defendant would lose his ability to connect logical progression of thoughts and would not be able to recognize whether someone was setting him up to make a statement. (Tr. II, 45).   Dr. Waldman testified that the statements Defendant made were not reliable. (Tr. II, 46).   Dr. Waldman also concluded that the statements were not freely, voluntarily, or willfully made, but a product of a diseased and medicated mind. (Tr. II, 46).

On cross-examination, Dr. Waldman confirmed that he was not Defendant's treating physician and he was not present on the days Defendant was monitored by Deputy Sutphin. (Tr. II, 51).   The Government showed Dr. Waldman hospital records from January 20, and February 3, 2010, which appeared to indicate that Derisma was verbal and that he understood on those dates the information that was being provided to him. (Tr. II, 55).   The Government established that on January 20 and 22, 2010, the Defendant denied he was in pain which Dr. Waldman confirmed that during that 30-second interaction meant he was not hurting.   (Tr. II, 56). Dr. Waldman reaffirmed that he was not indicating the Defendant could not communicate, only that the communications would not have been reliable.   (Tr. II, 57).

On redirect, Dr. Waldman confirmed that Deputy Sutphin and Defendant's jocular relationship was relevant for determining whether Defendant was deluded as to his position. (Tr. II, 61).   Dr. Waldman stated that in a state of euphoria, "familiar people tend to give us comfort and familiar people tend to make us feel like we know them." (Tr. II, 61).

## DISCUSSION

Defendant moves to suppress his statements made while hospitalized regarding Defendant's criminal activity, including: statements about selling cocaine in the Lee County area; possessing a kilo of cocaine in his vehicle the night he was stopped by Deputy J. Turner; methods he used to traffic cocaine and what he did with the proceeds; statements claiming he received cocaine by the kilogram from his father in Brazil, and paid seven thousand ($7,000.00) dollars per kilogram; statements claiming he shipped cash and other items to his family in Haiti where he claimed to own a hotel and a concrete business in Port Au Prince; and, statements where he claims to have owned several businesses in Florida, including an auto body shop, which allegedly was a front for his cocaine business. (Doc. # 216, Def. Mot. to Sup., ¶ 4).    As grounds, Defense Counsel argues that Defendant's statements were a result of custodial interrogation and are unreliable due to Defendant's brain surgery, compromised immune system, and dementia. Furthermore, Defendant was under the influence of numerous medications and was unable to knowingly and voluntarily waive his <u>Miranda</u> rights, and provide a free and voluntary statement. Defendant further argues that there is insufficient evidence that the statements were actually made, besides the testimony of an officer who is motivated to fabricate allegations. (Doc. # 216).

In response, the Government argues that Defendant's statements made to Deputy Sutphin six (6) months after his arrest were voluntary and were not the product of coercion or interrogation. The Government also argues that the Defendant's statements are relevant to the charges and that Deputy Sutphin was not investigating this case or interrogating the Defendant while he was monitoring Defendant's hospital stay.   As grounds, the Government argues that in the Eleventh

Circuit, absent an allegation of coercive police tactics to obtain the statement, Defendant's confession will not be deemed involuntary, regardless of any mental illness. (Doc. # 224).

*Whether Derisma Made Free and Voluntary Statements to Deputy Sutphin While in the Hospital*

In this case, the Court must determine whether Defendant James Derisma's statements during his hospital stay in 2010, were freely and voluntarily made and if they should be admitted into evidence. Miranda v. Arizona, requires that before a defendant in custody can be interrogated the Defendant must be informed of: (1) the Defendant's right to remain silent; (2) that statements can and will be used against them in a court of law; (3) that the Defendant has the right to an attorney during questioning; and (4) that if the Defendant cannot afford an attorney one will be appointed. 384 U.S. 436, 478-79, 86 S. Ct. 1602, 16 L. Ed. 694 (1966). Under Miranda, custody is the depravation of freedom of action normally associated with an arrest. Id. at 444. The initial determination of custody depends on the objective circumstances of interrogation and not on the subjective views harbored by either the officer or the Defendant. Stansbury v. California, 511 U.S. 318, 323, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994) (*per curiam*). It is also well-settled law under Wong Sun v. United States, 371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) (quotation marks omitted), that the exclusionary rule generally bars the admissibility at trial of tangible evidence as well as verbal statements acquired through unconstitutional means.

It is uncontested that the Defendant was in custody at LMH in January and February 2010, at the time he made the statements regarding his past criminal history, current drug activities, and relayed facts about the instant case. It is also uncontested that he was not read his Miranda warnings prior to any discussions at the hospital.[8] Therefore, the Court must determine if

---

[8] The Defendant was read his Miranda rights on July 29, 2009, after his first arrest for Possession of Cocaine as a result of a traffic stop of the vehicle driven by co-defendant Kristy Pastore. He denied knowledge of the presence of the contraband and refused to answer any more questions. (Transcript of Motion to Suppress, Doc. #225, p. 173)

Defendant was being interrogated during his hospital stay or if he freely or voluntarily made statements to Deputy Sutphin. While Dep. Sutphin testified that he was not trying to interrogate the Defendant during his hospital stay but was merely asking questions to keep the conversation going (Tr. 13-14), the focus of the inquiry is the perception of the suspect and not the intent of the police. U.S. v. McKenzie,132 Fed. Appx. 788, 789-90 (11th Cir. 2005).

    (1) _Whether Dep Sutphin Interrogated Derisma without giving him Miranda Warnings_

       The Supreme Court defined interrogation as "express questioning or words and actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Rhode Island v. Innis, 446 U.S. 291, 300-301, 100 S. Ct. 1682, 64 L. Ed. 297 (1980).   It is well known that while the Supreme Court has said that the Fifth Amendment prohibits an officer from interrogating an arrestee without reading that arrestee his so-called Miranda rights, the rule extends only to the functional equivalent of an interrogation. McKenzie,132 Fed. Appx. at 789-90 (_citing_ Innis, 446 U.S. 299).   The Supreme Court defined "functional equivalent" as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." McKenzie,132 Fed. Appx. 788, 789-90 (citing Innis, 446 U.S. 291, 300-01).   Thus, if the Defendant's responses to  Dep. Sutphin's questions were provided as part of an interrogation or the functional equivalent of an interrogation, it would be a Miranda violation to admit them since the Defendant was not read his Miranda rights.

       Dep. Sutphin testified that he asked the Defendant questions about his drug activities, his family and Haiti but never read the Defendant his Miranda rights. (Tr. 13-14).   He further testified that he and other LCSO's had been attempting to arrest Defendant, a known drug dealer, since

The Defendant further invoked his rights on August 7, 2009, after his arrest as a result of the Search Warrants executed at the storage facility. (Transcript of Motion to Suppress, Doc. # 225, p. 233).

2008, but were unable to do so. (Tr. 26). In this instance, it is clear from the testimony that Deputy Sutphin's actions, in holding conversations and asking questions concerning the Defendant's drug activities, constituted the functional equivalent of interrogation under <u>Miranda</u>. Dep. Sutphin knew the Defendant was in custody for drug trafficking. (Tr. 26). He deliberately asked questions regarding the Defendant's drug activities in North Fort Myers. (Tr. 13-14). Deputy Sutphin further testified that he told Detective Armado and Detective Snyder from the narcotics division about the conversations between he and the Defendant several times throughout his detail at LMH in order to pass along information the Defendant had given him about narcotics activities in North Fort Myers. (Tr. 11).

Dep. Sutphin had knowledge of the Defendant's alleged drug activities and asked questions regarding those activities. It is reasonable to believe that based on those inquiries he would likely elicit an incriminating response since they were directed at the Defendant's involvement in illegal drug activity. Moreover, Dep. Sutphin told narcotics detectives the Defendant's answers to the questions in order to aid them in their investigations.

Thus, it is clear that Dep. Sutphin's conversations with and follow up questioning of the Defendant while he was in LMH were in fact the equivalent of an interrogation for <u>Miranda</u> purposes. <u>See</u> <u>U.S. v. Gonzalez-Sandoval</u>, 894 F. 2d 1043, 1046-47 (9th Cir. 1990)(holding that an interrogation occurred where border agents had reason to believe that a person was entering the country illegally and therefore, would incriminate themselves with answers when asked about their identity and national origin).

Dep. Sutphin also testified that he never read the Defendant his <u>Miranda</u> rights. However, statements that are voluntarily made may be used even if no <u>Miranda</u> warnings were given. Thus,

the Court must examine the circumstances to determine if the Defendant freely and voluntarily made statements to Dep. Sutphin.

*(2)Whether the Defendant's Statements were Voluntarily Made*

Voluntary statements - even those made without a <u>Miranda</u> reading - are admissible as long as they are given freely and voluntarily without compelling influences. <u>Id</u>. at 299-300; <u>Miranda</u>, 86 S. Ct. at 478. There is a two part inquiry into whether or not a defendant's waiver of <u>Miranda</u> rights was voluntary, knowing , and intelligent. <u>U.S. v. Barbour</u>, 70 F.3d 580, 585 (11th Cir. 1995(citing <u>Moran v Burbine</u>, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 410 (1986)).  "First the relinquishment of the right must have been voluntary in the sense voluntary that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." <u>Id.</u> "Second, the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Id.</u> Only if the totality of the circumstances surrounding the interview reveal an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived.

The Defendant contends that his mental state and dementia prevented him from being able to voluntarily waive his <u>Miranda</u> rights.  However, the mere fact that the defendant may suffer from a mental disability does not by itself render his statements involuntary. <u>Id.</u>

Instead, the Court must determine whether or not the Defendant was fully aware of both the nature and consequences of the decision to abandon his <u>Miranda</u> rights**.** <u>Id.</u>  In this instance, the Court notes that the Defendant was never advised of his <u>Miranda</u> rights by Dep. Sutphin during is questioning and conversations. Thus, the Defendant was not even made aware of his rights to

counsel or to remain silent. However, even if not notified, the Defendant could still make voluntary statements.

The Defendant argues that he was incapable of being aware of the consequences of any potential waiver due to the fact that he had brain surgery and was on a variety of pain killers and narcotics. The Defendant had on two prior occasions invoked his <u>Miranda</u> rights when talking to officers about this case. <u>Supra</u>, n. 8. While a prior statement invoking one's <u>Miranda</u> rights does not mean that Defendant did not offer a voluntary statement in this instance, it does show that the Defendant was previously disinclined to speak with the police regarding his alleged illegal drug activity. It is also an indication to the Court that the narcotics and pain killers the Defendant was on during his stay in the hospital may have made him unaware of the consequences of his statements.

The Defendant's expert witness, Dr. Waldman testified that the Defendant was on intravenous morphine sulfate which is one of the more potent forms of opiate derivatives given as painkillers. (Tr. II, 31-33). Opiates produce a euphoric dream state, which is one of the negative side effects of the drug. (Tr. II, 33-34). He was also given the option of using oxycodone which is also a painkiller that can cause loss of touch with reality. Further, the Defendant was prescribed Lorazepam which is a benzodiazepine, a minor tranquilizer. (Tr. II 35). Benzodiazepines affect cognition, are disinhibiting, which can cause individuals to say things they otherwise would not say, and can cause individuals to lack judgment and insight into the things that they do say. (Tr. II 35-36). Dr. Waldman explained that it does not mean that what is said is not reliable, it just means that the Defendant rambled on about what was in his mind; and what was in his mind was delirious thought, feelings, and delusions. There was no or less inhibition because of the

Lorazepam to keep those delusions inside. (Tr. II 37). Dr. Waldman testified that under the influence of these pain killers and narcotics, he can opine with reasonable medical certainty that Defendant was disinhibited and could not make a voluntary statement under this condition. (Tr. II, 40). Although it is up to the Court to conclude legally whether the Defendant's statements were made voluntarily, the Court agrees with Dr. Waldman that due to the array of narcotics the Defendant was prescribed while in the hospital the Defendant's statements were not voluntarily made.

Dr. Waldman also testified that the statements Defendant made were not reliable, which creates a question as to whether Defendant had the capacity to understand the consequences of his conversations. Dr. Waldman further opined that the Defendant was susceptible to the Deputy's trickery and was not able to recognize follow up questions in regard to trickery. (Tr. II, 45). Consistent with the finding that the Defendant's statements were not voluntarily made, the Court also believes the Defendant did not have the capacity to understand the consequences of speaking with Deputy Sutphin, therefore, the statements should not be admissible.

As a result, based upon the medical opinions presented at the hearing by Dr. Waldman, the Defendant was unable to knowingly and voluntarily waive his Miranda rights. When viewed objectively under the totality of the circumstances, any incriminating responses provided by the Defendant to Dep. Sutphin regarding his family, work, life and involvement in the illegal drug business in North Fort Myers were not freely and voluntarily made. Thus, it is respectfully recommended the Defendant's statements regarding the circumstances of this case which were made in response to Deputy Sutphin's conversations and questions while he was in LMH were

made in violation of the Defendant's <u>Miranda</u> rights, and the Motion to Suppress such statements should be granted.

Accordingly, it is now

**RESPECTFULLY RECOMMENDED:**

The Defendant's Amended Motion to Suppress and Exclude Statements of Defendant (Doc. # 216) should be **GRANTED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within **fourteen (14) days** from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this __18th__ day of February, 2012.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record